**THATCHER A. STONE**
New York State Bar No. TS5571
Pro Hac Vice Application Pending
45 Rockefeller Plaza, Suite 2000
New York   NY   10111
Telephone:  646-873-7521
Facsimile:    646-873-7529 (No Service by Fax Accepted)
Email:   thatcher@thatcher-stone-legal.com


**NICOLAS V. VIETH**
Bar Nos. ID 8166 / WA 34196
Vieth Law Offices, Chtd.
601 East Sherman Avenue, Suite 1
Coeur d' Alene   ID   83814
Telephone:    208.664.9494
Facsimile:    208.664.9448
Email:   nick@viethlaw.com

Attorneys for Plaintiff
**JAMES H. HUNTER**

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF WASHINGTON

### CASE NO. CV-11-292-RMP_____

**COMPLAINT - 1**

| | |
|---|---|
| JAMES H. HUNTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO. CV-11- 292-RMP_____ |
| vs. | ) |
| | ) |
| (1) SOTERA DEFENSE | ) |
| SOLUTIONS, INC., *FORMERLY* | ) |
| *KNOWN AS* GLOBAL DEFENSE & | ) |
| TECHNOLOGY SYSTEMS, INC., | ) |
| | ) |
| (2) GLOBAL STRATEGIES GROUP | ) |
| (UNITED KINGDOM) LIMITED, | ) COMPLAINT FOR FALSE |
| AN ENGLISH COMPANY, | ) IMPRISONMENT, FALSE |
| | ) ARREST, PRIMA FACIE TORT, |
| (3) GLOBAL STRATEGIES GROUP | ) BREACH OF CONTRACT, |
| HOLDING S.A., A LUXEMBOURG | ) OUTRAGE, VIOLATIONS OF |
| CORPORATION, | ) PLAINTIFF'S CIVIL RIGHTS, |
| | ) TORTIOUS INTERFERENCE |
| | ) WITH CONTRACT, AND |
| (4) GLOBAL STRATEGIES GROUP | ) BREACH OF INSURANCE |
| (MIDDLE EAST) FZE, A DUBAI | ) CONTRACT AND BAD FAITH |
| CORPORATION, | ) BY AN INSURER AND ITS |
| | ) BROKER OF RECORD |
| (5) GENNAKER INSURANCE | ) |
| COMPANY LIMITED, A BERMUDA | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| AND | ) |
| | ) |
| (6) LOCKTON COMPANIES LLP, | ) |
| A LIMITED LIABILITY PARTNER- | ) |
| SHIP IN LONDON, ENGLAND, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

COMPLAINT - 2

## INTRODUCTION

This is an action by a United States Air Force veteran, a resident of the City of Spokane, Spokane County, Washington against a global intelligence, security, defense and technology group of companies operating as a single economic entity known as Global Strategies Group (being all of the Defendants excluding Global FZE, hereinafter defined; hereinafter, "Global").  In the Eastern District of New York, Mr. Hunter has commenced an action[1] against two air carriers, Lufthansa and Etihad, for breaching their duties of care and their contracts of carriage to Mr. Hunter when they accepted his firearms for transit to service in Iraq as a security consultant for Global FZE, supplying security to the Iraqi Ministry of Transportation, by mis-routing him, failing to transit him "in bond" or return him to his origin as required by custom and practice, and discriminating against him when compared to the care and attention given to other passengers in similar circumstances.  In the case of Global, for intentionally lying and making false representations to the authorities in Abu Dhabi that Mr. Hunter was not an employee of a Global subsidiary, when in fact he was, thereby causing a breach of the subsidiary's contract with Mr. Hunter

---

[1] United States District Court, Eastern District of New York, Case No. 09-CV-3166 (RJD) (JMA).

**COMPLAINT - 3**

Hunter to use best efforts to free him, and a general duty to be truthful, which Global knew or should have known was wrongful and would cause Mr. Hunter great harm. This intentional and false representation gives rise to a claim for tortiuous interference with contract on the part of Mr. Hunter against Global resulting in a breach of Mr. Hunter's contract with Global FZE and thus seeking the same damages as are being sought against Global FZE.  As to Global FZE, for breach of contract, including the failure to provide Defense Base Act required Insurance, failure to provide personal accident insurance, and false arrest and imprisonment or prima facie tort, resulting in a variety of damages. The combined actions of Global and Global FZE resulted in the incarceration of plaintiff, James Hunter, in one of the world's most notorious prison, famous for stoning, rapes, beatings, whippings and death, Abu Dhabi's Al Wathba Prison, for 37 days, preceded by incarceration in a police station jail and hotel for six days, and further false imprisonment in the country of Abu Dhabi, U.A.E., for another 17 days thereafter; all constituting claims for false arrest and/or false imprisonment or prima facie tort, breach of contract, negligence and intentional infliction of emotional distress (all Global Defendants and Global FZE ) and tortious interference by the Global Defendants Mr. Hunter's contract with Global FZE.  In addition, a claim for breach of insurance against Gennaker Insurance

**COMPLAINT - 4**

Company Limited is made herein, the Global-controlled personal accident insurer for Mr. Hunter while employed, which in bad faith has refused coverage despite multiple demands, and has refused to negotiate in good faith. This case is a recitation of outrageous and despicable facts and circumstances occasioned by Global, which resulted in the most outrageous treatment of a black Aviation Military Security Specialist with twenty-nine documented years of experience, one of America's finest veterans, a loyal citizen who served his country as a Special Ops Combat Controller (Pathfinder) in the U.S. Air Force (the men who precede an invasion via airborne insertion into hostile territory to establish ground to air navigation for invading forces to follow). Mr. Hunter seeks a minimum of $385 million in compensatory damages for sixty days of intolerable captivity (Global Defendants), for tortious interference (Global Defendants), for his expenses and lost property (all Defendants), a minimum of $25 million in damages for violation of his civil rights under 42 USCA § 1981 (Global Defendants), damages for intentional infliction of emotional distress (Global Defendants), outrage (all Global Defendants) and an unspecified amount of punitive damages, against all Defendants because their conduct shocks the conscience. Mr. Hunter's contract with Global FZE contains an arbitration clause. Mr. Hunter commenced an arbitration against Global FZE which proved

**COMPLAINT - 5**

to be unconscionable and thus unenforceable under 9 U.S.C.A. § 1, *et seq.*, and the Federal Arbitration Act, *generally*. Mr. Hunter was asked to pay expenses exceeding his annual income to maintain arbitration, and the arbitrator's final decision ignored fully presented evidence and applicable legal rules.

## ALLEGATIONS

1.  Plaintiff, James Hunter (hereinafter "Hunter / Mr. Hunter"), by his Attorneys, Thatcher A. Stone and Nicolas Vieth, (Mr. Stone's Pro Hac Vice application being submitted coincident to the filing of this pleading), for his complaint against (A) Global Strategies Group, a confusing array of domestic and foreign companies operating as a single economic unit under the brand "GLOBAL," including all of the named Defendants in this action, with an office in the United States at Global Defense Technology & Systems, Inc., 1501 Farm Credit Drive, Suite 2300, McLean, Virginia 22102-5011,[2] and (B) Gennaker Insurance Company Limited, a Bermuda insurance company, located in Pembroke, Bermuda with only one office

---

[2]  In order to ensure the proper adjudication of claims against Global's foreign assets, the Mr. Hunter has elected to sue and serve several Global constituents abroad, as a prophylactic measure, even though service on one in the U.S. should be sufficient service on all universally. Global Strategies Group (United Kingdom) Limited and Global Strategies Group Holding S.A., a Luxembourg corporation, will be served pursuant to the Washington State Long Arm statute or otherwise in accordance with law.

**COMPLAINT - 6**

also in Pembroke, and upon information and belief subject to additional

discovery, a company under the control of Global, alleges as follows:

2. All allegations in this Complaint (including the foregoing and the

Introduction) are based on information and belief and have or are likely to

have evidentiary support after reasonable opportunity for further

investigation or discovery.

**PRELIMINARY STATEMENT**

3. This is an action for (A) breach of contract (All Global Defendants), (B)

false arrest and imprisonment or in the alternative, prima facie tort (all

Global Defendants), (C) intentional infliction of emotional distress (all

Global Defendants), (E) violation of the Mr. Hunter's civil rights under 42

U.S.C.A. §1981 (all Global Defendants); (F) tortious interference by

Global (other than Global FZE) with Mr. Hunter's rights and benefits

under the Independent Contractor Services Agreement between Mr.

Hunter and Global FZE, attached as Exhibit A hereto; (G) outrage, a

common law tort for harassment in the State of Washington (All Global

Defendants); and (H) breach of an insurance contract and bad faith; all as a

result of Defendants' deliberate, intentional, malicious, reckless, shocking

and outrageous behavior as hereinafter set forth.  Mr. Hunter seeks in

**COMPLAINT - 7**

excess of $75,000 in damages from Defendants and demands a trial by jury against Gennaker, Global and Global FZE.

**PARTIES**

4.    Mr. Hunter is a U.S. citizen and is a resident of the City of Spokane, State of Washington.  He is a former Air Force Pathfinder and is a Veteran of Desert Storm.

5.    Mr. James Hunter is a black, African-American, member of a suspect class under 42 U.S.C.A. § 1981.

6.    Global Strategies Group ("Global") is a confusing array of companies and other enterprises, which at all times relevant hereto being September 2005 until November 2008, were operated in unison as alter egos of one another and as a single joint enterprise, as hereinafter alleged, including but not limited to SOTERA DEFENSE SOLUTIONS, INC., formerly known as GLOBAL DEFENSE TECHNOLOGY SYSTEMS, INC., a Delaware company located in Virginia, GLOBAL STRATEGIES GROUP (UNITED KINGDOM) LIMITED, an English company, GLOBAL STRATEGIES GROUP HOLDING S.A., a Luxembourg corporation, and GLOBAL STRATEGIES GROUP (MIDDLE EAST) FZE, a Dubai corporation ("Global FZE"), which together seek to take advantage of security and

COMPLAINT - 8

intelligence businesses on a worldwide level by holding themselves out to the public on their website, in recruiting, and elsewhere as a single global enterprise.  Global advertises on the internet as a single global enterprise capable of fulfilling missions all over the world, seeks employees from various sources for the one enterprise "GLOBAL," and otherwise conducts itself as a single economic unit and enterprise.  Global is the alter ego of a number of Global companies that operate together and as a single economic unit, including the former Global Defense Technology & Systems, Inc., now known as Sotera Defense Systems, Inc., a corporation created under the laws of Delaware with its principal office in McLean, Virginia ("Global USA"); Global Strategies Group (United Kingdom) Limited, formed under the laws of and located in England ("Global England"); and Global Strategies Group Holdings, S.A., a Luxembourg corporation ("Global Luxembourg").  Mr. Hunter had a contract to provide services as an Independent Contractor to Global Strategies Group (Middle East) FZE, yet another Global company ("Global FZE").  "GLOBAL," as it refers to itself on its website[3] is branded and identified by a single elongated blue globe with the word "Global" inside.  Perusing the web

---

[3]  www.globalgroup.com

**COMPLAINT - 9**

site, Global is identified as doing business in a variety of other countries as well as in the Americas, including Africa, the Middle East, Asia, China and Japan, including Iraq.  The website clearly identifies but one corporate vehicle.  The various Global enterprises hold themselves out to the world as a single, global enterprise.  In fact, Global uses special purpose companies around the world to limit risk and liability to Global, and allegedly to defraud employees and creditors, as hereinafter set forth.  To allow the Global group to avoid responsibility as a single alter ego of all its constituent companies obligations would be unfair and fraudulent to the numerous employees, recruits and others who believe they are doing business with Global, and not some special purpose company.

7.    Global Strategies Group (United Kingdom) Limited does business in St. James's, London where the COO, Ms. Elisabetta Zaccaria responds to email and telephone calls on behalf of several companies in the Group and where "Global" is identified as the answering party on the after-hours answering service.  Global and its personnel in London perform functions for other Global entities around the globe.  *See*, Exhibit A.

8.    Mr. Hunter, the plaintiff, was hired by Mr. Harry Harrington from Global in 2006.  Mr. Harrington sent numerous letters, emails, made phone calls,

COMPLAINT - 10

and generally transacted business with Mr. Hunter in Spokane, using

jurisdictional means.  In these communications to Spokane, Mr.

Harrington represented to Mr. Hunter that Mr. Harrington worked in

London and he represented that he worked for "Global."  He represented

to Mr. Hunter he would be hired by "Global," which Harrington knew at

the time was untrue, and which proved untrue, and which he falsely

represented in order to lure and induce Mr. Hunter to work in Dubai.

9.     After Mr. Hunter was recruited to work for Global by business transacted

in Spokane, Washington, he was sent an airplane ticket by Mr. Harrington

from London to Spokane, to fly to Dubai.  Mr. Harrington never told Mr.

Hunter that he would be employed by a Dubai company known as Global

Strategies Group (Middle East) FZE operating in Iraq.  In fact, Mr. Hunter

was led to believe his employer was Global.  Based on Mr. Harrington's

fraudulent inducement, while transacting business in the State of

Washington, Mr. Hunter accepted the offer made to him in Spokane and

traveled from Spokane to Dubai.  However, upon arrival in Dubai, Mr.

Hunter was asked to sign a contract with this separate, thinly capitalized

and independent entity, Global FZE.  *See*, Exhibit B.

**COMPLAINT - 11**

10.     Mr. Hunter was told  if he had insisted on a contract from "Global," he would be abandoned in Dubai.  Mr. Hunter was unemployed and did not have a ticket home.  Thus, under duress and pressure, he accepted the Independent Contractor Services Agreement.

11.     Global does business in the United States.  Sotera, formerly known as Global Defense & Technology Systems, Inc., at all times relevant hereto also claimed to be part of the Global Group and remains headquartered in McLean, Virginia, and portrays itself as doing a high volume of business with the United States government.  It marketed itself using the "Global" single blue globe logo (hereinafter referred to as "Global USA").  *See, e.g.*, the Form of Amendment No. 3 to Form S-1 registration statement for Global USA, filed with the U.S. Securities and Exchange Commission on 29 October 2009, attached as Exhibit C, employing the identical logo.

12.     Global USA sold a large portion of its Common Stock pursuant to a registration statement with the Securities and Exchange Commission.  The proceeds were used, among other things, to repay the United States $16 million in loans and advances to upstream corporate affiliates off shore the United States, including Global Strategies Group Holding S.A., a Luxembourg Corporation.  It is not shown in the registration statement

**COMPLAINT - 12**

where the money is going from Luxembourg.  Rather than leave the proceeds of sale of Global North America's common stock in the United States for general corporate purposes, the capital is being used to finance what looks like a single commercial enterprise offshore the United States.  *See*, Exhibit D, an extract from the registration statement of Global USA.

13.    Global USA acknowledges in its S-1 the misleading and fraudulent nature by which the various companies which at the time called themselves "Global" hold themselves out to the public.

> "In recent years, the media and committees of Congress have focused attention on the provision of security services by private contractors operating overseas. Our largest beneficial stockholder performs such services. Because our largest beneficial stockholder shares with us the "GLOBAL" name and corporate logo, there is increased risk that the market will confuse the actions or perceptions of our largest beneficial stockholder with those of our company.  To the extent that the government or the media perceive that GLOBAL has not complied with applicable laws or rules, the resulting publicity could, regardless of the accuracy of such a perception, harm our reputation and our business and cause our share price to decline."

From Global USA's S-1 filed October 29, 2009.

**COMPLAINT - 13**

14.    Kevin Pye, an individual who worked with Global FZE in Dubai and in Baghdad, also identifies himself on his "Linked In" social networking page as an employee of Global Strategies Group (Middle East) FZE as well as "Global Strategies Group" - without further modification or identification.  *See* Exhibit E.

15.    Similarly, Mr. Dale R. Davis, who is registered on the social networking site "Linked In," identifies himself as a "commercial director" at Global Strategies Group Integrated Security in the United Arab Emirates, as well as having previously been a managing director at Global Strategies Group (Middle East) FZE.  However, Mr. Davis in 2009 was making phone calls to companies and friends in the United States seeking "men" he can employ in Afghanistan with "Global," representing he is an employee with "Global."  *See* Exhibit F.

16.    Compounding matters, even though Mr. Hunter was originally hired by Harrington from "Global" in London, and was then asked to sign a contract with Global Strategies Group (Middle East) FZE, he was nonetheless paid in dollars from New York in 2006 by what appears to be a bank account unrelated to Global Strategies Group (Middle East) FZE. *See* Exhibit G.

COMPLAINT - 14

17.   The Global company profile on "Linked In" at the time relevant hereto reflected that it was one company with offices in McLean, Virginia; London, England; and Norfolk, Virginia; and that it had over 2000 employees, and referred viewers to the Global web site.  *See*, Exhibit H. The Global web site operated by Global holds Global out as a single, world leading company providing security and intelligence services, and not a collection of disparate limited purpose companies.

18.   The Global web site failed, and continues to fail, to distinguish between the numerous Global entities operating outside of North America but under the Global rubric.  The web site contained, during all periods relevant to this claim, references to Global operations in no less than 25 countries including the United States and North America, without identifying who does what, but rather identifying the combined efforts of everyone referred to on the website as part of the "Global" branded enterprise.

19.   No less than 25 individuals identified themselves on the social networking site "Linked In" as employees of both Global USA and "Global Strategies Group."  *See, e.g.*, the "Linked In" page for Andrew Bryden, attached hereto as Exhibit I.

**COMPLAINT - 15**

20.    Multiple employees of Global have multiple job assignments for multiple entities. *See, e.g.*, the job description for Ms. E. Zaccaria, who is COO of "Global," sits in London, and also has multiple job assignments throughout the group of companies known only as Global.  *See*, Exhibit A.

21.    The four named Global Defendants are managed and operated as a single economic entity, share people, money and other resources, use one company to raise money in the U.S. for another, shares a single brand they admit is confusing, such that it would be inequitable for the Court to uphold a legal distinction among them, or between any two, or all of them, because to do so would create an element of injustice and unfairness to Hunter and other creditors who relied on the representations implied by a single brand, "Global."

22.    This Court has personal long-arm jurisdiction over all of the Global Defendants because they are an alter ego of one another, and both Global England and Global FZE transacted business in the State of Washington in connection with hiring Mr. Hunter, buying airplane tickets for Mr. Hunter, and sending Mr. Hunter remittances to the State of Washington, continuously transacting business in the State of Washington for over three years.

**COMPLAINT - 16**

23.   Global USA, now known as Sotera, is subject to the personal long-arm jurisdiction of the State of Washington because its counsel, Messrs. Skadden Arps, admitted in proceedings before the U.S. District Court for the Eastern District of New York that Global USA had transacted business in Washington by hiring the individuals which harassed Mr. Hunter, constituting the tort of outrage, as hereinafter more fully set forth.

24.   This Court has jurisdiction over Gennaker Insurance Company Limited, a Bermuda insurer, because it issued a policy of personal accident insurance for the benefit of Mr. Hunter in fulfillment of Global's obligation under the Contract (defined hereinafter at paragraph 33) to provide personal accident insurance for Mr. Hunter.  Gennaker is not admitted to offer and sell insurance in the State of Washington, but by having placed insurance for Mr. Hunter, a resident of the State of Washington, under a group general accident policy, as admitted by Global FZE's counsel Messrs. Clyde & Co. in a recent arbitration, Gennaker is subject to the personal long-arm jurisdiction of the State of Washington.

25.   Lockton Companies LLP, Lockton House, The St. Botolph Building, 138 Houndsditch, London EC3A 7AG, are Gennaker's disclosed brokers of record, and participated in the refusal to pay Mr. Hunter's claim and bad

**COMPLAINT - 17**

faith.  Because Hunter was living in the State of Washington at the time the Lockton Companies LLP participated with Gennaker in their fraud and wrongful refusal to pay a claim, and bad faith, Lockton Companies LLP is subject to the Washington State long arm establishing personal jurisdiction in this State in connection with a tort committed in this State.

### JURISDICTION & VENUE

26.    This Court has jurisdiction over the subject matter of this action pursuant to (A) 28 U.S.C.A. § 1332 (a) (2) (diversity) (all claims except civil rights claims, all Defendants); and (B) 28 U.S.C.A. § 1331 (as to the claim of civil rights violations under 42 U.S.C.A. § 1981).

27.    Venue in this district has been selected by Mr. Hunter pursuant to 28 U.S.C §§ 1391(a) (1), and/or 1391 (b) (1) because it is a District in the United States in which the Defendants regularly solicit or conduct business, thereby making them subject to personal jurisdiction before this Court.

### GENERAL ALLEGATION OF AGENCY

28.    Mr. Hunter is informed and believes, and thereon alleges, that at all times herein mentioned, the Defendants and each of their respective agents, contractors and employees were the agent, servant and employee of the

COMPLAINT - 18

relevant Defendant, and at all times herein mentioned, was acting within the purpose and scope of said agency and employment.  Whenever reference in this complaint is made to any act, omission or transaction of a Defendant, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, contractors and/or representatives of that Defendant committed, knew of, performed, authorized, ratified and/or directed such act, omission or transaction on behalf of such Defendant while actively engaged in the scope of their duties.

**FACTUAL ALLEGATIONS**

29.    James Hunter was solicited by Global through Global's employee in London, Harry Harrington, by transacting business at Mr. Hunter's residence in Spokane, Washington to facilitate Global's objectives at the Baghdad International Airport in Iraq, by contracting with Global as a Security Operative/Security Consultant, pursuant to a contract Global had engaged in with the Iraq Ministry of Transportation.

30.    Harry Harrington, from Global's London offices, called Mr. Hunter several times at his residence in Spokane and requested that Mr. Hunter send to Mr. Harrington his resume and copy of his current passport.

**COMPLAINT - 19**

Harrington held himself out as a member of a London based security firm called Global, not a Dubai organized Limited Liability Company.

31.  Mr. Hunter had a military background and following the request sent his resume to Mr. Harrington at Global in London.  The documents requested by Mr. Harrington were sent from Mr. Hunter's residence in Spokane, Washington where the request was received, to Global in London.

32.  In addition, Mr. Harrington asked Mr. Hunter to provide Global with a background check at Mr. Hunter's expense which Harrington requested by telephoning Mr. Hunter at his residence in Spokane, Washington. Thereafter, at Mr. Hunter's own personal expense, and commencing with activities from his residence in Spokane, Mr. Hunter contracted for and obtained a U.S. police background search and sent it from Spokane, Washington to Mr. Harrington in London.  Prior to the time Mr. Harrington requested Mr. Hunter to leave for Dubai and then Baghdad as an employee of Global, there were numerous contacts initiated by Mr. Harrington using elements of interstate commerce and other jurisdictional means, directed to Mr. Hunter's home in Spokane, Washington from London, England and also, from Spokane to London.

**COMPLAINT - 20**

33.   After Harrington told Mr. Hunter he was hired for his first tour in 2006, Mr. Hunter obtained an air ticket which provided travel for Mr. Hunter from Spokane to Dubai as well as return tickets back to Spokane, at Global's expense sent from London to Spokane.  Separately, Global arranged travel to Baghdad.

34.   After meeting representatives of Global in Dubai in the summer of 2006, Mr. Hunter was then flown to Baghdad, where he was asked to sign a purported contract between himself and Global Strategies Group's Middle East Enterprise domesticated in Dubai, a subsidiary of Global.  A new contract was re-executed for each subsequent tour of duty.  The form of contract used for Mr. Hunter's last tour of duty is attached as Exhibit B (the "Contract").

35.   When Mr. Hunter asked his superiors in Iraq what was the connection between the company in Dubai and Global, he was told "not to worry about it," and that it was for "regulatory purposes."  When he enquired further, he was told he could go home.  He did not have a ticket to go home and he had no money. He was forced to accept Global FZE under duress and upon the fraudulent inducement of Global.

COMPLAINT - 21

36.  On two more occasions after this initial occasion and tour in Iraq, Mr. Hunter took vacations, returned for a six month and then a later three month period to work with Global at the Baghdad Airport in Iraq as a security consultant.  Each air ticket was from Spokane to Dubai and return, paid for by Global transacting business in part, in the State of Washington.

37.  In June or July of 2008, Mr. Hunter made arrangements to return to work for Global in Baghdad at the airport as Mr. Hunter had done several times before.  Arrangements were made for him to arrive towards the end of July or the beginning of August, 2008.

38.  During Mr. Hunter's prior tours with Global in Iraq, he found there to be numerous difficulties with the provision of weaponry required for his employment with Global.

39.  Hunter complained frequently to his superiors that the automatic weapons and handguns provided to Global employees in his position at the airport were unsatisfactory and in many cases, dangerous.  For example, Global armed a unit assigned to secure a U.S. helicopter division of which Hunter was the project manager with poorly maintained AK-47 semi-automatic rifles, instead of U.S. manufactured weapons like the M-16.  Handguns furnished were frequently inappropriate and in some cases, were part of a

cache of Glock 17 handguns that were paid for by the United States but which disappeared into the black market, and somehow came into the hands of Global.

40. Principal among Mr. Hunter's concerns about using the AK-47 is that in nighttime operation, the silhouette of this weapon is clearly identifiable and familiar to U.S. military operatives who, also patrolling and involved in protecting not only the airport but also its perimeter, could easily mistake an individual carrying an AK-47 for an insurgent.  In addition, the handguns offered to employees by Global were faulty and frequently fell out of their holsters.

41. Faced with these concerns and no action on the part of Global, Hunter requested and Global agreed that Hunter could bring U.S. manufactured personal sport weapons including a semi-automatic rifle, sighting accessories, and handguns with him on his next tour in Iraq.  His supervisor, Chris Brookbank, and also fellow employees Ron Roush and Tom Olds were also advised.

42. Global allowed personal weapons by its operatives at the airport in Baghdad and even built a special storage area for them for safety purposes.

**COMPLAINT - 23**

43.  Accordingly, before his departure in late July of 2008 for Baghdad, Mr. Hunter visited a local sporting goods store in Spokane, Washington and purchased new personal sport rifles, handguns and accessories in accordance with permission from Global.

44.  Mr. Hunter was very concerned about the manner in which the firearms he had purchased would be transported to Baghdad for his use in compliance with all applicable regulatory regimes for transporting the firearms.  Mr. Hunter requested and Global paid for and arranged his travel to fly with United Airlines from Spokane, Washington, through Denver, Colorado, on to Washington Dulles Airport in Chantilly, Virginia and on to Frankfurt. Finally, Mr. Hunter was booked on a continuation flight from Frankfurt to Dubai, also with Star Alliance[4] member and Defendant Lufthansa.  Upon arrival in Dubai, Mr. Hunter would remain in transit for an Iraq Airline flight from Dubai direct to Baghdad.  The flight arrangements were approved, arranged and paid for by Global.

---

[4]  As described _infra_, the Star Alliance are a group of world airlines who have obtained antitrust immunity in order to manage their routes, fares, baggage, passengers, and loyalty programs in concert, including Lufthansa and United. Star Alliance markets in it's own name and encourages passengers to rely upon a global network of carriers in lieu of a single carrier without worldwide coverage.

**COMPLAINT - 24**

45.   Once the flight arrangements were made Mr. Hunter, a former special operations staff sergeant in the United States Air Force, a Pathfinder and an honorably discharged and decorated veteran, commenced his typical fastidious preparation in anticipation of service abroad and the need to comply with law.  He contacted each airline he would fly to confirm the status of checking his firearms as baggage and transporting his firearms.

46.   Hunter spoke to United Airlines and in furtherance of those discussions, actually visited the Spokane, Washington airport in order to have a face-to-face conversation about the propriety of taking his sport firearms with him to Iraq on his reserved itinerary.  Mr. Hunter spoke with a United representative, a man standing about six foot one inches (6'1") tall with silver hair, regarding his checking of firearms.

47.   The United representative explained to Mr. Hunter that as long as his arrival at his destination with his firearms was approved and lawful, United would be pleased to carry his firearms, along with the other carriers, on the rest of his journey provided he complied with all TSA and FAA regulations.  Lufthansa told Hunter the same when contacted by telephone.

**COMPLAINT - 25**

48.   The applicable TSA and FAA regulations provide that firearms must be identified to the airline and to TSA personnel.  The firearms must be shown to be unloaded and locked in secure luggage for transport.  A special "red tag" (firearms declaration form) is to be completed, inserted into the luggage prior to locking after a thorough inspection by TSA.  The airline ticket agent was informed of the inspection and the screener operating x-ray equipment for checked baggage was advised of the firearms.  Mr. Hunter was convinced after a number of attempts in following up and ensuring to himself that his details were correct and that he had, in fact, done everything required to ship his firearms as checked baggage, and confirmed his arrangements with Global and with United, a member of the Star Alliance, to which Defendant Lufthansa also belongs.

49.   On the day of departure, July 29, 2008, Mr. Hunter had a ticket and contract of carriage on United and Defendant Lufthansa from Spokane, Washington, to Dubai.  Mr. Hunter appeared at the Spokane, Washington Airport with one backpack and a computer case, his sole carry-on items, and one piece of checked luggage – his firearms.  The firearms consisted of a sport rifle, and sport handguns, together with scopes, sites and associated firearm accessories for cleaning and maintenance.  The TSA

**COMPLAINT - 26**

inspector, Mr. Van Lee, known to Mr. Hunter from his prior employment with TSA, inspected the weapons, completed the red tag, inserted the red tag in the luggage containing the firearms, advised United of a satisfactory inspection, and a baggage claim check was issued to Mr. Hunter showing his destination as Dubai, the baggage being carried by United pursuant to its contract of carriage.

50.  Mr. Hunter then submitted himself to the TSA search and commenced his journey to Dubai via Denver, Dulles and Frankfurt, commencing with United, pursuant to his contract of carriage.  The Lufthansa contract of carriage is attached hereto as Exhibit J.  The Etihad contract of carriage is attached hereto as Exhibit K.  Both permit the checking of firearms as baggage by Mr. Hunter.

51.  Lufthansa knew or should have known from the TSA baggage processing and the Star Alliance communication procedures that Mr. Hunter was carrying firearms approved for legal transit with prior clearance having been obtained from TSA, and even if they did not, Mr. Hunter told them so.  In addition, Lufthansa knew or should have known that Mr. Hunter had spoken to Lufthansa representatives earlier in June about the transit through Frankfurt and on to Dubai with his firearms on Lufthansa.

**COMPLAINT - 27**

52.    On July 30, 2008 at approximately 11:45 a.m., Frankfurt, Germany time, Mr. Hunter arrived in Frankfurt, Germany, disembarked from the aircraft and proceeded inside the general public terminal to his Dubai departure gate. After waiting for approximately two hours in a public terminal area not controlled by Lufthansa, a gate agent showed up. Mr. Hunter checked with her about the flight to Dubai and she informed him the flight was cancelled due to a strike and that his journey as planned on Lufthansa was interrupted. He was directed to the transfer desk and from that location directed to the main ticketing counter near the "A" Terminal Lufthansa check-in desks. Lufthansa had an agent working the line, assisting passengers, a male with brown hair and average build, 40ish. The representative at the desk had light colored hair, wore thin rectangular glasses, was thin, and seated. This man was informed of Hunter's special baggage and arranged its transfer to Etihad.

53.    The Lufthansa representative was concerned for Mr. Hunter because he knew his ultimate destination was Dubai, according to Lufthansa's own records, but because of industrial actions or strikes involving Lufthansa, the flight on Lufthansa's schedule to Dubai was not operating and as a result, the Lufthansa employee advised Mr. Hunter he could fly with

**COMPLAINT - 28**

Etihad Airways in a couple of hours,  to Abu Dhabi and travel onward to

Dubai on a Lufthansa chartered "shuttle;" alternatively, the Lufthansa

employee indicated to Mr.  Hunter that he could remain in Germany

overnight and re-commence his travel to Dubai early the next day, on

Emirates Airlines, which would of course interfere with his then current

reservation on Iraqi Airways.

54.  Mr.  Hunter replied to the Lufthansa employee that, "I have only one

concern about any changes to my travel to Dubai, and that is the firearms

in my checked luggage."  The Lufthansa representative and Mr.  Hunter

confirmed with a phone call that Mr.  Hunter's luggage had arrived and

the Etihad baggage handler was transferring the checked luggage with the

firearms to the Abu Dhabi flight.  Mr. Hunter said to the Lufthansa

representative, "I have weapons in my checked luggage.  This is the only

and most important issue I have."

55.  The Lufthansa representative replied, "This is no problem, now go,

quickly, before the Etihad flight closes, pick up your boarding pass down

the hall at the Etihad desk, and your bag will travel on the flight with you."

56.  Based on this representation from Lufthansa's employee to Mr. Hunter

that Mr. Hunter could take his firearms to Abu Dhabi on Etihad, and

**COMPLAINT - 29**

transit by ground to Dubai, without impediment, and yet still reach his final destination of Baghdad, Mr. Hunter proceeded to pick up an Etihad Flight EY 2 boarding pass, and departed by air for Abu Dhabi.

57. At no time did Mr. Hunter agree that he had modified or altered or amended his contract of carriage. At all times Mr. Hunter had fully performed his contract of carriage.

58. Lufthansa knew that Mr. Hunter was carrying firearms and that his final destination was Dubai, because it accepted them from United and then for interline baggage transfer to Etihad, and Mr. Hunter also told Lufthansa, face-to-face in Frankfurt. Lufthansa's contract of carriage permits a passenger to check firearms in baggage with Lufthansa, and Mr. Hunter told Lufthansa's employee in Frankfurt he was the owner of firearms in his checked luggage. Lufthansa and United Air Lines are both partners in the Star Alliance and brag on their website about the enhancements available to passengers when confining their global travel to the Star Alliance partners, including better service and information about flights, better flight connections, and better information about transit of interline

COMPLAINT - 30

baggage.[5]  Etihad knew or should have known about Mr. Hunter's firearms

in his luggage because Etihad's contract of carriage permits a passenger to

check firearms in baggage with Etihad, and Mr. Hunter told Etihad's

employee in Frankfurt, face-to-face, that he was the owner of firearms in

his checked luggage.  Both Lufthansa and Etihad knew or should have

known that a visa for Abu Dhabi and a weapons entry license or permit

would be required in order to enter the country and is not the same as

those for Dubai.  It is not only standard practice, it is an IATA policy that

a passenger who arrives without conforming entry documents must be sent

back to his place of origination, in this case, Frankfurt, by the carrier who

---

[5]  **Star Alliance Connections Service.**  It only takes one delayed flight to throw your travel plans into chaos. Well you can rest assured that our 'Connections' service at key alliance hubs is working away behind the scenes. With the help of special software, Star Alliance Connection Centres are solving problems by continually monitoring your in-bound and out-bound flights, and will take steps to minimize the effects of any delays in your journey.  The arrival and departure times of your flights are monitored so that potential misconnections can be flagged.  If needed, at select airports a staff member meets the incoming aircraft and guides you through the terminal or to direct plane-to-plane bus transfers.  This will eliminate your stress should for any reason your plane arrive late at the transfer airport.  **Rest assured in all our airports we are working on transferring your baggage, so that it travels with you at all times.**  There are currently nine Star Alliance Connection Centres in the network at the following airports: …Frankfurt… *See*, http://www.staralliance.com/en/_travellers/benefits/connections.html (viewed May 15, 2009) (emphasis added).

**COMPLAINT - 31**

brought him to a destination without proper paperwork.  Neither Lufthansa nor Etihad followed these standard practices, subjecting Mr. Hunter to arrest.  Had they faithfully performed and completed their duties, Mr. Hunter would never have turned up in Abu Dhabi to begin with.

59.   Mr. Hunter never checked the legal regime for transiting Abu Dhabi on the ground with his firearms because he never expected to go there, he did not have enough time to do so in the Frankfurt public terminal, and he expected the airlines to guide him in the event of a change or interruption in his journey.  Had the Lufthansa agent in Frankfurt not told Mr.  Hunter that absolutely and positively he could travel to Abu Dhabi with his firearms, he would have delayed his journey and rearranged his circumstances so as to perpetuate the transit nature of his weapons in Frankfurt, and continued to Dubai the next day, where he knew his firearms were lawful and permitted in transit to Iraq without entering the country.  In fact, as Mr. Hunter discovered subsequently following incarceration, Abu Dhabi prohibits firearms for entry into the country except in certain circumstances, like when one is in transit to another country and does not enter Abu Dhabi, or one has a license, or one can establish another lawful reason to enter the country with firearms.  But the

COMPLAINT - 32

Lufthansa agent and the Etihad agent said just the contrary, and Mr. Hunter relied on his air carriers and the Star Alliance in continuing his journey, as altered, to his detriment. Both Lufthansa and Etihad know or should have known that a visa for Abu Dhabi and a weapons entry license or permit would be required in order to enter the country for ground transit to Dubai and is not the same as those for merely transiting Dubai, never entering the country, and connecting to Baghdad. It is not only standard practice, it is an IATA policy that a passenger who arrives without conforming entry documents must be sent back to his place of origination, in this case, Frankfurt. Neither Lufthansa nor Etihad followed these standard practices, subjecting Mr. Hunter to arrest. Had they faithfully performed and completed their duties, Mr. Hunter would never have turned up in Abu Dhabi to begin with.

60. There was no reason or circumstance that Mr. Hunter should have failed to place his faith and trust in the Lufthansa employee who assumed the duty of ensuring that Mr. Hunter continue his transportation on Lufthansa without interruption and as best as possible according to plan. In addition to the Star Alliance representations, Lufthansa makes similar

COMPLAINT - 33

representations on its own website.[6]  Mr. Hunter's sole checked luggage was clearly identifiable as an airline approved firearms case.

61. When Mr. Hunter arrived in Abu Dhabi, disembarked from the aircraft, and entered the public terminal with other passengers from other flights, his baggage did not appear with the rest of the baggage on the luggage carousel, and he informed the baggage personnel he was expecting a very long rifle case and felt it required special handling because of its size.  A baggage handler was dispatched and soon returned with the rifle case. Mr. Hunter confirmed to Etihad employees, to the police who investigated, and to the Customs Authorities who investigated, that he owned the firearms in his luggage, that the luggage was his, and that he was employed by Global in Iraq towards which he was going as they could see from his tickets, ID's and other details.  He explained that his journey had been interrupted in Frankfurt due to an industrial event or strike, and that

---

[6]  As a founding member of the Star Alliance we offer, together with our 17 airline partners the world's largest network of destinations.  With all the advantages of a large and proven alliance like coordinated timetables, overall validity of the frequent flyer programs, privileges with check-in **and luggage** and much more." *See,* http://www.lufthansa.com/online/portal/lh/us/info _and_services/partner?nodeid=1771801&l=en&cid=1000390 (viewed may 15, 2009) (emphasis added).

**COMPLAINT - 34**

he had been told by Lufthansa that he should continue his trip to Abu

Dhabi, whereupon he would be "shuttled" to Dubai for the continuation of

his journey.  Mr. Leonard D'Souza for Lufthansa and Mr. Hihun Seleke

for Etihad were assigned to work with Mr. Hunter after he was stopped.  It

was in Abu Dhabi that Mr. Hunter discovered that being "shuttled" to

Dubai *meant entering the country of Abu Dhabi*.  This was not made clear

to him by the Lufthansa agent in Frankfurt.

62.    Neither Lufthansa nor Etihad offered to place Mr. Hunter "in bond" for the

60 mile journey to the airport in Dubai, a regular and frequent occurrence

for passengers who have no visa for Abu Dhabi, and have been re-routed

from an original destination of Dubai.  There is no air service between the

two emirates.  Neither Lufthansa nor Etihad offered to return Hunter to

Frankfurt for re-routing to Dubai.  Both Lufthansa and Etihad knew or

should have known that entry in to Abu Dhabi without a proper visa and

with firearms is a criminal offense, and yet, they took Hunter to Abu

Dhabi anyway.

63.    Mr/ Hunter did not have a visa for Abu Dhabi because he never expected

to be sent there.

COMPLAINT - 35

64.    When asked by the authorities at the airport and later in a police station, whether or not he was employed in Baghdad as he claimed, Mr. Hunter immediately offered all of the contact details for Global in Dubai and in Baghdad, and stated unequivocally that Hunter was an employee of Global.  Global provides documents in English and Arabic to show proof of employment and a valid entry visa for Iraq.  This visa is very difficult to obtain and is time sensitive.

65.    Mr. Hunter had advised Global prior to leaving Spokane, Washington that he was, in fact, traveling with the firearms that they promised him he would be free to bring and use on the job.  In addition, when Mr. Hunter arrived in Abu Dhabi and was detained, he sent emails to Global who acknowledged that he would be delayed.  Global responded to those emails.

66.    At one point while in custody for three days in a police controlled airport hotel, an Etihad agent told Mr. Hunter he was still in transit, and he should buy a ticket to Frankfurt.  Hunter was given permission to leave the airport hotel where he was being held and do so inside the public terminal.

67.    Thereafter for several days, Mr. Hunter was directed by the Abu Dhabi authorities to stay at the airport hotel, and on the day he was to fly out to

COMPLAINT - 36

Germany and back to Dubai he was told he could not fly out and was suddenly taken to the Al Khaliffa Police Station in Abu Dhabi, miles from the airport, where interrogation continued for the fourth or fifth day following his arrival.  Interrogation usually started in the mid-afternoon and it continued into the early morning hours, frequently depriving Mr. Hunter of sleep.

68.   Sometime during his stay at the hotel and prior to his transfer to the holding cell in the local jail, Mr. Hunter discovered that Global, on or about August 3, 2008, had intentionally, wrongfully, maliciously and with reckless disregard for the outcome, denied any knowledge of Mr. Hunter's employment or involvement with Global or subsidiaries in an official statement made in response to an official inquiry by the Abu Dhabi police.  On or about August 3, 2008, Martin Strutton at Global had been telephoned by the authorities in Abu Dhabi to confirm that Mr. Hunter was, in fact, an employee of Global as his visas and ID's indicated.  At the instruction of Kevin Pye, an employee of Global England as well as Global FZE, Martin Strutton, an employee of Global FZE, lied to the authorities about Mr. Hunter, and claimed Mr. Hunter was not a Global employee, when in fact he was.  If his employment had instead been

**COMPLAINT - 37**

confirmed, Mr. Hunter was told by the authorities in Abu Dhabi, he would have gone free.

69. Martin Strutton confessed to Ron Roush, another Global employee, a statement against interest, that Martin had engaged in this wrongful conduct at the request of Kevin Pye identified herein as an employee of both Global England and Global FZE.

70. The statements made as instructed by Strutton were malicious and made with malice, because Global has a policy of keeping a low profile in the Middle East and elsewhere. Company policy is not to leave no man behind, but rather, as punishment for running afoul of any municipal legal regime, leave the man behind. Pye instructed Strutton to lie about Mr. Hunter as punishment for Mr. Hunter for being stopped by the Abu Dhabi police, leaving his planned routing, and raising Global's visibility, and was done with intent to harm Mr. Hunter as punishment for becoming too visible to the authorities with his weapons, and breaking the law, Pye believed, in Abu Dhabi.

71. Attached as Exhibit L to this complaint is a translation of the official judgment rendered against Mr. Hunter by the court in Abu Dhabi which states, among other things, that the failure to have proof of employment

**COMPLAINT - 38**

from Global and Global FZE and nonetheless carrying weapons while entering the country was a principal reason for his arrest.  Thus, it was Kevin Pye's malicious action and instruction to Martin Strutton that caused Mr. Hunter's false arrest and imprisonment.

72.  It is clear from the judgment, and according to Abu Dhabi law, that if Kevin Pye, the representative of Global England, had not instructed Martin Strutton, the employee of Global FZE, to lie to the Abu Dhabi authorities, and instead had told the truth about Mr. Hunter, that he was employed by Global FZE and was in fact on his way to Baghdad with previously approved firearms, then Mr. Hunter would never have suffered incarceration.  Mr Pye tortiously interfered with Mr. Hunter's contract with Global FZE by doing so.

73.  The legal proceedings involving Mr. Hunter in Abu Dhabi were completely devoid of due process including the inability to obtain counsel, and the inability to have a lawful and experienced translator.  Mr. Hunter was convicted and remitted to the notorious Al Wathba Prison on the charges of unlawfully importing firearms into Abu Dhabi and entry without a visa.  As a result of the negligent, intentional, malicious, despicable and outrageous conduct of Global, Mr. Hunter was false

COMPLAINT - 39

imprisoned for about 60 days, and suffered outrageous and unbelievable injuries, including a heart ailment, PTSD, high blood pressure, skin infections and lesions, and material disability, some of which may be lifelong, as a result of his imprisonment in Abu Dhabi at the notorious Al Wathba Prison.  Said prison has only recently gained international disgust because of the broadcast by several news agencies of the manner in which Abu Dhabi officials treat those with whom they have problems, without resort to the rule of law, independent judges and due process.  *See, e.g.*, http://www. youtube.com/watch?v=0i8fJcW0Yd8&feature=related, viewed May 25, 2009.[7]  The injuries have prevented sleep, work and good health.

---

[7]  The United Arab Emirates (UAE) authorities have announced that they will open an investigation into allegations of serious criminal assault committed by a member of the country's ruling family, after a graphic video had been recently circulated.  The video shows Sheikh ' bin Zayed Al Nahyan, brother of the UAE president, Sheikh Khalifa bin Zayed Al Nahyan, hitting a defenseless man with a board from which a nail is protruding, setting light to his pubic hair, choking him with sand and driving a motor vehicle over him, apparently breaking his limbs.  Two other people including a uniformed police officer can be seen assisting in the assault, believed to have been committed in Abu Dhabi in 2004.  *See*, http://www.amnestyusa.org/all-countries/united-arab-emirates/page.do?id= 1011262 (viewed May 15, 2009)

COMPLAINT - 40

74.    Upon arrival at the notorious prison, the Mr. Hunter was separated from his medication, his wallet, weapons permit, computer.  He was required to surrender his clothing, including his shoes, and he was given a malodorous, ill-fitting pair of blue prison uniforms and no shoes or flip-flops for his stay, which at that point was of an indeterminate duration.

75.    Mr. Hunter was placed into a cell designed for six inmates which had more than twenty-nine inmates inside.  The Turkish toilet was barely functional and human waste of every description overflowed its brim.  There were bugs and vermin crawling on the floor, and other occupants of the cell had open wounds on their feet, hands and faces.

76.    The situation in the Al Wathba Prison was terrible.  Known as a place where stoning, beatings, rapes, whippings and murders took place regularly, and due to shock and the absence of his blood pressure medication and shoes for his feet, the absence of which convinced him he had contracted terrible pathogens within a day upon arrival, Mr. Hunter slept fitfully sitting slumped over and when he did sleep was unable to control his bodily functions through fear and a sense of abandonment, as well as a sense of Kafka-esque futility.  The Guards and other prisoners

COMPLAINT - 41

were frightening.  Corporal punishment was frequent.  Mr. Hunter was so scared he soiled himself numerous times.

77.   After about ten days of these outrageous, deplorable conditions, little sleep, no acceptable food, no medical attention, one five minute phone call, and harassment constantly from the trustees, Mr. Hunter was removed from the prison and taken back to court, in leg shackles, handcuffs and chains as if he was a slave.

78.   During these proceedings in Abu Dhabi several judges presided over a procedure which could hardly be called fair or resembled anything remotely akin to due process.  The judges made several jokes in English about the irony of an experienced aviation security specialist being imprisoned.  Mr. Hunter was not afforded the opportunity of counsel; no interpreter was provided for him by the court; a volunteer from the court agreed to interpret for Mr. Hunter but when it was obvious this person was one-sided against Mr. Hunter, another individual in the courtroom volunteered and began to interpret.  There was no opportunity for defense and no opportunity to present one.  The court ruled that Hunter was guilty of unlawfully importing weapons into the country, namely the firearms in

**COMPLAINT - 42**

his baggage, claimed Global were also at fault, and punished him by a jail sentence of two months as well as a fine of approximately $1,500. Whereupon Mr. Hunter was returned to a most notorious, disgusting and revolting prison, Al Wathba.[8]

79.    No one from Global or Global FZE appeared to assist and help Mr. Hunter at his trial, even though he had sent emails and messages advising them of his predicament.

80.    Upon his return to Al Wathba, Mr. Hunter began to fear for his life.  It was impossible to get money exchanged for several weeks in order to buy

---

[8]  Ex-inmates of the Al Wathba Central prison have some startling stories to relate.  They say that the Jail in Abu-Dhabi has 10 clandestine blocks where nearly 2,000 people from the Third World countries are being held like medieval slaves, mostly for crimes they had never committed.  Many of them are Indians.  Some of them are women and some teenage boys.  Almost all of them have been detainees for years.  George Titus Valliazam, a banker from Kerala, has been a prisoner in Al Wathba since 1986.  For 12 years he has shared with nine other prisoners a 10 by 10 - nondescript cell.  The block where his cell is located has 200 prisoners who are forced to live in inhuman conditions with rudimentary toilets and faulty plumbing.  Valliazam eats two coarse meals a day, wears a gunny jail jersey (rarely gets a change), does the laundry, sweeps the floor, cleans clogged toilets - and yet gets routinely flogged.  Every night, he retires to his unventilated cell to sleep on the scorching floor.  His wife and daughters, whom he left behind in Kerala for the United Arab Emirates (UAE), still wait for him.  They know he is languishing in Al Wathba but it is the truth they haven't told their neighbors.  *See*, http://www.uaeprison.com/pioneer.htm#pr (viewed May 15, 2009).

COMPLAINT - 43

necessities, so he had to scrape together bits and pieces of soap from the bathroom floor in order to have something to wash with.  There were no toothbrushes or oral hygiene materials provided.  The food was inexplicably horrible, indefinable and inedible and served without utensils.  A departing Western prisoner gave Mr. Hunter an old, dilapidated plastic Coca-Cola bottle, so that Mr. Hunter would have an instrument from which to drink liquids.  Otherwise he would have had to use his hands.  Given the conditions for human bodily functions, the non-functioning toilets and the like, Mr. Hunter realized it was imperative to keep your hands clean at all times.

81.    Unable to reach family or friends via telephone, phone privileges were restricted to eight minutes every two weeks, he did insist upon and was given brief visiting privileges with representatives of the United States Embassy in Abu Dhabi.  The Embassy staff were quite helpful in organizing notice to Mr. Hunter's friends and arranging a transfer of funds to pay the fine which otherwise would have been extremely difficult to do from prison.  Mr. Hunter's only close remaining family member was his eldest brother, who suffered from a weak heart.  The situation would have

**COMPLAINT - 44**

been too much for his brother to bear.  The US Embassy was given strict instructions not to contact him.

82.  While Mr. Hunter was imprisoned at the notorious Al Wathba after his trial, a colleague from Global by the name of Shawn Leech traveled from Dubai to Abu Dhabi and saw representatives of the United States Embassy.  For some reason immediately after this visit, Mr. Leech was terminated by Global and now works with a different company.  Finally after approximately thirty-seven days of incarceration, and the payment of his fine, Mr. Hunter was provided with a release from Al Wathba; however, he was unable to leave the country for a further seventeen days because of the failure of the government to return to him his passport nor allow him to travel until alleged further claims "in the system," if any, would mature and be brought to the attention of the authorities possibly resulting in further incarceration in Abu Dhabi.

83.  As a result of having been restricted to a quite expensive hotel by the authorities for his second dose of the Abu Dhabi version of "house arrest," Mr. Hunter was required to spend almost $7,000 in hotel charges and food because of the hotel selected intentionally by the police.  Finally, on

**COMPLAINT - 45**

September 26, 2008, Mr. Hunter departed Abu Dhabi at his own cost and expense for air carriage of more than $7,400, only to discover upon review of his mail and email that after he had notified Global FZE by email and telephone that he was in accordance with their agreement transporting his firearms to Iraq, which they consented to, and after they were informed of his delay in Abu Dhabi, and after having received that communication, that instructed by Global, Global FZE had lied to the Abu Dhabi police on or about August 3, 2008, that Global FZE had terminated him three days later on August 6, 2008 for failing to show up in Baghdad on time, allegedly for failing to inform Global FZE as to his whereabouts.  Nothing could be further from the truth.  Thus, Global and Global FZE are estopped to deny the fraudulent, false, intentional and reckless statements and instructions made by Kevin Pye of Global to Martin Strutton of Global FZE to lie.

84.   Global knew at the time it made its instructions to Strutton to make intentional false statements to the authorities in Abu Dhabi concerning Mr. Hunter and his alleged absence of employment with Global FZE that the statements were false; maliciously intended them as punishment for Mr.

**COMPLAINT - 46**

Hunter getting caught with weapons in Abu Dhabi, though not his fault; knew that if Global FZE made false statements to the authorities in Abu Dhabi as a result of Mr. Hunter's predicament that great harm and injury would result; and made them nonetheless so as to teach Mr. Hunter a lesson.  The statements were made with intentional and complete malicious, reckless and willful, in fact outrageous disregard for the rights and well-being of Global FZE's employee and comrade-in-arms, Mr. Hunter.

85.     Etihad knew or should have known at the time Mr. Hunter identified his baggage concerns to the individuals from Lufthansa and Etihad at the airport in Frankfurt that his baggage contained firearms.  The contracts of carriage from both carrier Defendants each provide that firearms are subject to the acceptance of the airline.  Once the luggage was checked in with United in Spokane, Washington, Lufthansa knew or should have known what was in Mr. Hunter's luggage as should have Etihad who took Hunter as a last minute passenger immediately after he explicitly identified the firearms in his luggage and his major concern about them to the representatives of Lufthansa and Etihad in Frankfurt.

**COMPLAINT - 47**

86.  When Mr. Hunter returned to the United States, his girlfriend complained that he was mumbling and shaking in his sleep, and actually sleep-walking.  Mr. Hunter has had to see medical experts to address his continuing nightmares and the physical effects of having suffered through approximately forty days in Al Wathba Prison, including disability and being unable to find work.

87.  Because he was denied his medication while imprisoned, Mr. Hunter's medical condition with respect to his high blood pressure has worsened. This has life-long implications for his health, and his longevity, both of which have been negatively affected and which can be attributed exclusively to his sojourn in Al Wathba Prison.  His EKG reflects a major change post Al Wathba prison.  He has been diagnosed with PTSD, which has lifelong implications for disability.

88.  Because of the arrest in Abu Dhabi for violation of firearms restrictions, violations of the entry requirements, absence of a visa and weapons license and the ensuing judgment, trial and incarceration, all of which were caused by Global's intentional false statements, Mr. Hunter's ability to seek work, obtain government employment and otherwise provide for

**COMPLAINT - 48**

himself and his family have been unfairly compromised.  He was unable to find work due to 70% disability for over three years.

89. Mr. Hunter's contract with Global FZE contains an arbitration clause.

90. Mr. Hunter commenced an arbitration proceeding against Global FZE for breach of contract, and other matters, a year ago.  The terms of the arbitration were grossly unconscionable.

91. Mr. Hunter established the unconscionability of the arbitration on the record, by establishing that the costs he was required to pay were an integral multiple of his annual income, and withdrew his claim from an unenforceable arbitration proceeding under the authority of the Supreme Court's decision in Green Tree Financial Corp. – Alabama vs. Randolph, 121 S. Ct. 513 (2000), and the Fourth Circuit's decision in Bradford vs. Rockwell Semiconductor Systems Inc., 238 F.3d 549 (4th Cir. 2001).

92. The arbitrator awarded a claim to Global FZE in the amount of approximately $65,000 USD.

93. The arbitrator's award was contrary to law and ignores substantial evidence presented to the tribunal of estoppel as to costs.  Therefore the

**COMPLAINT - 49**

arbitral award of Global FZE is unenforceable under 9 U.S.C.A. § 1, *et seq*.

94. Because the tortious interference claim against Global is not against Global FZE, the arbitration provisions of Mr. Hunter's contract with Global FZE do not prevent the maintenance of this claim against all of the other Global Defendants, and subject to a determination of the arbitration's unconscionability, Global FZE.  The contract between Global FZE and Mr. Hunter expressly excludes third party beneficiaries.

95. The senior staff of Global worldwide were aware of the Global policies of leave each man behind, and knew that when they punished Mr. Hunter for getting stuck in Abu Dhabi, he would be severely dealt with by the authorities.

**AS AND FOR A FIRST CLAIM**
**(All Global Defendants)**
**False Imprisonment and/or Arrest; Alternatively Prima Facie Tort**

96. Mr. Hunter repeats and restates the allegations of paragraphs 1 through 95 preceding as if set forth here in full.

97. By reason of the foregoing, Mr. Hunter was prevented from his free and unrestricted movement from Abu Dhabi to either Baghdad or the United

**COMPLAINT - 50**

States, and as a result was falsely imprisoned and falsely arrested and held in Abu Dhabi through the intentional, wrongful, reckless and malicious combined acts of Global and Global FZE, each of which had contractual and legal duties to Mr. Hunter which they breached intentionally and maliciously, which breaches by Defendants led directly to Mr. Hunter's conviction and prevented Mr. Hunter from traveling outside of prison and resulted in his physical restraint against his will for over sixty days.

98.    Global had a duty to be honest to the Abu Dhabi police and authorities inquiring about Mr. Hunter, and they lied intentionally.  Mr. Hunter incurred, among other things, substantial special damages including travel, lodging, food, transportation and communication expenses, attorney's fees, permanent injury, health problems, loss of property, PTSD, disability and emotional distress, and more than just loss of wages as a result of the Defendants' malicious and wrongful behavior, all to be proven at trial. The price of liberty is difficult to place a value on, but Mr. Hunter believes at least $2 million a day is warranted in this case based in part on other awards in similar cases, and Defendants' intentional behavior, for a total of $120 million for sixty days' loss of liberty and suffering in prison and

COMPLAINT - 51

in Abu Dhabi.  The actions of Defendants reflect a malicious, intentional,
willful, outrageous and reckless disregard of the rights of Mr. Hunter and
Defendants' duties; their actions also warrant an award of punitive or
exemplary damages, because the actions of Defendants are outrageous,
affect public policy and also shock the conscience.  Accordingly Mr.
Hunter seeks at least $120 million in compensatory and punitive damages
in an amount to be determined at trial for the cause of action in this claim,
false imprisonment and/or arrest or prima facie tort.

99.   In the alternative, Defendants' actions constitute a breach of duty to Mr.
Hunter, as a result of which serious damages were incurred, including
special damages identified above, and also for distress, medical issues,
skin lesions and disability, in addition to lost wages and the like.  If Mr.
Hunter is unable to establish a cause of action for false imprisonment and
false arrest, then the Global Defendants committed a prima facie tort.

**AS AND FOR A SECOND CLAIM**
**(All Defendants)**
**Intentional Infliction of Emotional Distress**

100.  Mr. Hunter repeats and restates all of the allegations in paragraphs 1 to 99
preceding as if set forth in full herein.

**COMPLAINT - 52**

101.    The Defendants, acting jointly and separately, were so reckless with their intentionally malicious and untrue statements that Mr. Hunter feared for his life, day in and day out for over 60 days.  Abandoned by his employer Global FZE, Mr. Hunter most likely would have died if not for the intervention of the U.S. Embassy.  This action of Defendants so shocks the conscience and is so outrageous in the scheme of human behavior that Mr. Hunter was a frightful, despicable mess while forced to endure Al Wathba, was convinced he would die in captivity, and was grossly mistreated and abused while incarcerated.  The price of liberty from fear and fright of death is difficult to place a value on, but Mr. Hunter believes at least $2 million a day is warranted in this case due to Defendants' behavior which shocks the conscience, for a total of $120 million compensatory damages for sixty days' fright from rape, stoning and beatings in prison in Abu Dhabi, the infliction of emotional distress; their actions warrant also an award of punitive or exemplary damages, because the actions of Defendants are outrageous, affect public policy and also shock the conscience.  Accordingly Mr. Hunter seeks at least $120 million in compensatory and punitive damages in an amount to be determined at trial

COMPLAINT - 53

for the cause of action in this claim, Intentional Infliction of Emotional

Distress by all Defendants for Mr. Hunter's sojourn in prison.

### AS AND FOR A THIRD CLAIM
### Violation of Civil Rights under 42 U.S.C.A. 1981
### (Global FZE and Alter Egos)

102.  Mr. Hunter repeats and restates all of the allegations in paragraphs 1-101

preceding as if set forth in full herein.

103.  Global FZE failed to enforce and give effect to the contractual rights of

the Mr. Hunter to be possessed of his property, to be safely employed, to

receive assistance when incarcerated and, once the incarceration occurred,

to be treated properly and defended under the terms of the Contract, and to

receive personal insurance, Defense Base Act insurance, and other benefits

under the Contract directly resulting in extensive and special damages.

Mr. Hunter demanded his Contract be enforced in writing upon return to

the United States and Global failed to enforce and give effect to the

contractual rights of Mr. Hunter under the Contract, first by interfering

with the same, and by engaging Counsel in the U.S.A., Messrs. Skadden

Arps, who interfered with the enforcement of Mr. Hunter's rights, by

refusing to produce insurance policies promised in the Contract (clauses

**COMPLAINT - 54**

8.1, et seq.), by refusing in bad faith to accept service, by refusing to have any discussions whatsoever reflecting good faith, and by refusing to enforce Mr. Hunter's Contract or cure the prior breach thereof by Global FZE. *See*, clause 8.3 of the Contract.

104.  Mr. Hunter is an African-American and a member of a protected suspect class under 42 U.S.C.A. § 1981.

105.  Other members of unprotected classes have not suffered the same fate as Mr. Hunter with Defendant Global and Global FZE in substantially similar circumstances, upon information and belief; and Global and Global FZE have fulfilled their obligations under the form Contract with other employees where Mr. Hunter was denied such performance because he is black.

106.  In failing to enforce Mr. Hunter's contract when requested in the State of Washington, each of the Global Defendants violated 42 U.S.C.A. § 1981 and the Mr. Hunter's civil rights by refusing to do so in the United States, and thereby subjecting Mr. Hunter to disparate treatment as specified in said § 1981. Mr. Hunter seeks damages for the Global Defendants' failure to defend him at trial, failure to attempt to remove him from jail, for lying

**COMPLAINT - 55**

to the authorities instead of assisting in his release, promised by Clause 8.3 of the Contract, by failing to provide the agreed insurances for both personal and Defense Base Act coverage, and other benefits which were received by other employees, demonstrating Mr. Hunter's disparate treatment under the Contract; and seeks compensatory and punitive damages in an amount to be determined at trial.  In addition, Mr. Hunter seeks his legal fees under the provisions of Federal law applying to successful prosecutions of this claim.

### AS AND FOR A FOURTH CLAIM
### Tortious Interference with a Contract
### (All Global Defendants, Other than FZE)

107.  Hunter repeats and realleges all of the allegations preceding in paragraphs 1-106 as if set forth in full herein.

108.  Global, through Kevin Pye instructed Martin Strutton to make false declarations to the Abu Dhabi authorities, namely, that Mr. Hunter on August 3, 2008 was not an employee of Global FZE when in fact, Global FZE did not terminate Mr. Hunter until August 6, 2008 and Pye knew this statement was incorrect.  Martin Strutton was then an employee of Global FZE and was acting for Global FZE when he lied to the Abu Dhabi

COMPLAINT - 56

authorities about James Hunter.  Martin Strutton confessed his actions to Ronald Roush.

109.    Mr. Hunter and Global FZE were parties to a contract in place between them, attached as Exhibit B hereto, on or about August 3, 2008, when Hunter was held in Abu Dhabi.  At that time, there was no breach thereof by Mr. Hunter and he had fully performed all of his obligations to Global FZE.

110.    Global and Kevin Pye knew that Mr. Hunter and Global FZE were parties to the Global FZE Contract.

111.    Global and Kevin Pye intentionally, recklessly, wrongfully and with malice, caused, permitted and thereafter acquiesced in the false statements made by Strutton at Pye's instructions to the authorities in Abu Dhabi that Mr. Hunter was not a Global FZE employee, as a malicious method of punishing Mr. Hunter for running in to problems.  Pye knew this action was wrongful as against Mr. Hunter and threatened Mr. Hunter's rights under the Contract.

112.    As a result of these false statements and instructions, by failing to provide a defense and disclaiming employment, Global FZE breached clause 8.3 of

**COMPLAINT - 57**

the Contract which was for Mr. Hunter's benefit, by failing to use its best efforts to assist Mr. Hunter and end his incarceration. Several days later, Global FZE breached the entire Contract by terminating Mr. Hunter without cause and despite its knowledge of the circumstances.

Global's instructions to Martin Strutton of Global FZE to make intentionally false statements to the Abu Dhabi police were malicious and wrongful as to Mr. Hunter and breached a duty Global FZE had, not to make false declarations to the police which would cause Mr. Hunter damage. Global also had a duty not to interfere in Hunter's Contract. Mr. Hunter has suffered extensive compensatory and special monetary, health and property damage as a result of Global's actions causing and forcing Global FZE to breach multiple provisions of the Contract, as set forth herein and to be proven at trial, constituting among other things false arrest and false imprisonment, breach of the Contract to provide two kinds of insurance, wages, and wrongful termination. Because the allegations in this cause of action reflect conduct by Global that was malicious, willful, reckless, and which showed a total disregard for the Mr. Hunter's rights,

COMPLAINT - 58

exemplary damages in an amount to be determined at trial also are

warranted.

### AS AND FOR A FIFTH CLAIM
### Global FZE and Alter Ego Defendants
### Breach of Contract

113.  All of the foregoing paragraphs 1-112 preceding are hereby incorporated

by reference as if set forth here in full.

114.  The Contract was never amended.

115.  Mr. Hunter fully and faithfully performed all of his obligations to be

performed under the Contract.

116.  Defendant Global FZE and as alter egos, the other Defendants except

Gennaker and Lockton Companies LLP, breached their contractual

obligations with Mr. Hunter under the Contract in numerous ways,

including but not limited to breaching the agreements to provide personal

and Defense Base Act insurance, to defend Claimant under the defense

clause, to attempt to have Mr. Hunter released under the capture clause,

failing to make payments to Mr. Hunter under the wages clause and

wrongful termination under the termination clause, numerous violations of

COMPLAINT - 59

Dubai law; and as a result, Mr. Hunter suffered compensatory and special damages in an amount to be determined at trial.

### AS AND FOR A SIXTH CLAIM
**Global USA and Alter Egos**
**The tort of Outrage**

117.    Defendant Global USA was originally sued by Mr. Hunter in the U.S.D.C. for the E.D.N.Y., and the same was dismissed without prejudice for failure to have personal jurisdiction over the Global Defendants in New York, by Chief Judge Dearie.

118.    During the pendency of that action, Global USA hired detectives to follow Mr. Hunter and his colleague, also a former Global employee, Ron Roush, throughout Eastern Washington.  This was admitted by Counsel to Global USA, Messrs. Skadden Arps.

119.    The detectives hired by Global USA followed Mr. Hunter and Mr. Roush in automobiles, on highways, on remote dirt roads, in the city, and in the country, at such high rates of speed that Mr. Hunter was fearful for his safety.

**COMPLAINT - 60**

120.  The Global Group is employed worldwide as a security and special operations fighting unit, among other things.  Its mercenaries are frequently armed and frequently have authority to shoot to kill.

121.  In addition to following Mr. Hunter, these people hired by Global USA trespassed on Mr. Hunter's and Mr. Roush's properties to observe them with spyglasses, and attempted to block or listen to cell phones.  There were numerous occasions of each of the three incidents:  road, property trespass and phone listening, all of which took place in the State of Washington.

122.  Because of Global's background, Mr. Hunter feared for his safety and his life.

123.  Because the Defendant Global USA's agents were so intrusive and frightening, following cars at high speed and trespassing, their conduct was extreme.

124.  The emotional distress felt by Mr. Hunter in being frightened for his life in the Spokane area as a result of these intentional car chases and trespasses, was inflicted on him intentionally by the Defendant Global USA.  Mr. Hunter made reports to the local police.  Mr. Hunter also was with his

COMPLAINT - 61

friend Ron Roush when a similar incident occurred in an automobile

belonging to Mr. Roush.

125.    As a result of the foregoing, Mr. Hunter feared for his life and suffered

headache and stomach pain, discomfort, was tempted to carry a lawful

firearm in his vehicle to protect himself, and was petrified given the

knowledge of what Global can do.

126.    As a result of the foregoing, Mr. Hunter suffered extreme worry, fear and

emotional distress caused by Defendant Global USA from the car chases,

trespasses and phone interceptions in the State of Washington contracted

for by Global USA.  Mr. Hunter seeks compensatory and exemplary

damages in an amount to be determined at trial from Global USA and its

alter egos for this cause of action, common law outrage, because the

actions of the Defendants were reckless, intentional and showed a flagrant

disregard for the Mr. Hunter's rights.

## AS AND FOR A SEVENTH CLAIM
### Failure to Honor Insurance Claim; Insurance Bad Faith
### Gennaker Insurance Company Limited and the Lockton Companies LLP

127.    All of the foregoing paragraphs numbered 1-126 preceding are hereby

incorporated by reference as if set forth in full herein.

**COMPLAINT - 62**

128. Pursuant to the Contract, Mr. Hunter was entitled to personal accident insurance, and other insurances by law.  The personal accident insurance was placed through a company affiliated with Global, called Gennaker Insurance Company Limited, located in Pembroke, Bermuda.  It was placed as a group policy.

129. When Mr. Hunter returned to the U.S. from Abu Dhabi, he specifically asked Global FZE and Global England for his insurance details, and they made the Gennaker contract of insurance available to Mr. Hunter.

130. Mr. Hunter made a claim under the Gennaker policy.  Mr. Hunter was told in his arbitration with Global, by counsel to Global, Messrs. Clyde & Co., London, that Mr. Hunter was covered by the Gennaker policy.

131. Gennaker refused for months to either accept or reject the claim, acting in bad faith.

132. Eventually, Gennaker claimed Mr. Hunter was not covered by the policy, conflicting with the admission of counsel in the arbitration and the plain language of the policy.

133. Gennaker's disclosed agent, the Lockton Companies LLP, of England, one of the world's largest privately owned insurance brokers, confirmed to Mr.

**COMPLAINT - 63**

Hunter that Global controlled Gennaker and were controlling Gennaker's decision not to pay.  Despite repeated demand, Gennaker never paid Mr. Hunter's claim and the Lockton Companies were complicate in denying the claim.

134.  Mr. Hunter relied on the existence of a policy for his personal accident losses and believed at all relevant times he was the beneficiary of a group policy for his benefit; and the same was admitted by Clyde & Co. in the arbitration between Mr. Hunter and Global  FZE.

135.  As a result of the foregoing, the Lockton Companies and Gennaker Insurance Company Limited have jointly and severally breached, obstructed and prohibited the lawful recovery by Mr. Hunter under his personal accident insurance for claims incurred, totaling over $20,000 plus interest.  The failure to pay has been wrongful and made in bad faith, such as claiming a group policy did not inure to an individual's benefit and delaying the processing of claims for months; and all of the foregoing done in bad faith by both Gennaker and Lockton in order to deny Mr. James Hunter his lawful and entitled insurance benefits.  As a result of the foregoing breach and bad faith, Mr. Hunter is entitled to compensatory and

**COMPLAINT - 64**

exemplary damages, including treble damages for the insurer's and its agent's bad faith and civil conspiracy in failing to process Mr. Hunter's claim for months, and then refusing to pay it.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### All Defendants – Legal Fees of the Plaintiff

136. To the extent provided by Washington law, and not provided by Federal law, Mr. Hunter demands that the Defendants be liable in this action for any cause of action sounding in tort pay his legal fees for the prosecution of the causes of action herein contained. *See generally*, RCW 12.20.060; RCW 49.48.030; and Wash.R.Civ.P.54(d).

137. In addition, all compensatory damage claims shall include interest from August 4, 2008 to the date of payment at the judgment rate.

### PRAYER FOR RELIEF

138. WHEREFORE Hunter demands judgment against the foregoing Defendants upon the foregoing causes of action at the compensatory and - where indicated - exemplary level of damages established at trial. In addition, on account of Global's outrageous conduct while in the prosecution of this country's security mission in Iraq with U.S. tax dollars

COMPLAINT - 65

and program funds, and Global USA by harassing Mr. Hunter in an

attempt to obstruct justice in a Federal case; by Global FZE lying and

leaving a man behind, an order determining that each Global Defendant

has violated the so-called "integrity rule" of the Federal Debarment

Regulations, 48 C.F.R. § 9.406-2(a)(1)-(5).

### JURY DEMAND

139.   Pursuant to the Federal Rules of Civil Procedure, Mr. Hunter demands a

trial by jury of all issues so triable.


DATED this 3rd day of August, 2011.


                                   */s/ Thatcher A. Stone*_____
                                   THATCHER A. STONE


DATED this 3rd day of August, 2011.


                                   */s/ Nicolas V. Vieth*_____
                                   NICOLAS V. VIETH


**COMPLAINT - 66**